Thank you, Your Honor. Yes, may I please report? My name is Debbie Boris and I represent the State Defendant. Defendant's motion presents a very narrow question for this court. Whether to say the district court orders that, one, do not remedy the alleged constitutional violation the district court set out to remedy, which is to provide the Coleman class member with inpatient intermediate care facility treatment, and two, forces the Department of Mental Health Clinicians to provide care that falls below the standard required by state law and that results in the class members being held in their cells for longer periods of time with the likelihood that they will become violent. The answer to this question is yes for three main reasons. First, the C-5 unit at Salinas Valley State Prison is a licensed intermediate care facility program for high custody inmates that's operated by the Department of Mental Health at the Salinas Valley State Prison. Because of this type of program that the C-5 unit offers, state law requires the program provide a certain level of care to the inmates admitted to that program. My understanding is the district judge has adjusted state law to the degree that you asked him to do that. And that this, I gather, has been happening throughout the very long history of this litigation. That is, that state law licensing laws and others have sometimes had to be adjusted to deal with emergencies. Is that right? Yes, that's correct. But the other situation, the waivers have not impacted patient treatment. For instance, the waiver that was referenced in the paper, the mental health crisis bud temporary 20-bed unit at SAC, that waiver related to physical plant requirements under Title 22. It did not relate to patient treatment or increased admission. The same with another example that was provided, a 64-bed intermediate care facility program at Salinas Valley. In that case, the waivers were related to completing, painting, and other minor construction items that needed to be completed in order to obtain licensure. In that case, the CDCR presented evidence that the treatment for the inmates would not be impacted. This is a Department of Mental Health facility. Most of the patients, or almost all of them, are coming from what the district court thinks are totally non-helpful situations in terms of getting any treatment at all. But those programs, insofar as they are set to provide treatment, are not Department of Mental Health programs for the most part. So they don't have a licensing problem. That's correct. Is that what you're asking? That is correct. So, in other words, the basic point is that as long as they're in the care of CDC, they can be treated. There's no licensing, and therefore the fact that, as some of the older declarations and so suggest, and as the district court has found, they either aren't being treated or they're being treated in a greatly suboptimal way, does it raise the same concerns just because of the formality of who's treating them? No. Your Honor, the inmates that are the focus of this particular motion, the 91 inmates that are being admitted and have been admitted to the C-5 program, are coming from EOP, the Enhanced Outpatient Program, levels of care in general population. That program is not an inpatient license program, but it does provide, as this brewer, the executive director for the Salinas Valley Psychiatric Program testified, it does provide for certain levels of treatment, including 10 hours per week of therapeutic treatment. All of those inmates are receiving care in an EOP program. Now they're being moved to a program where they're not provided any treatment. And the reason they're not provided any treatment is why? It's because by increasing admissions from five inmates per week to 10 inmates per week, the Department of Mental Health Care can only do intake. So you're basically saying, in effect, if we were to credit your affidavits and all, is that they're just being moved over and warehoused with no treatment and no yard time, et cetera? Yes, that's correct, Your Honor. Could you explain one thing I didn't quite understand? Because for the brief it said, well, some of this could be remedied within two months and some within six months. Yes. The two months refers to the inmates that were admitted to the C5 unit after the court's October 25th order that required increased admissions at 10 per week. At that point, 25 inmates had already been admitted to the unit. So the additional 33 inmates that were admitted after the two-month period refers to those 30 inmates. The six-month period is the period of time that will apply once the Department of Mental Health recommences admissions on January 18th. At that point in time, they'll be admitting 58 inmates into the unit. And the record is that the problem is not the death. Correct. The problem is only physical space. Yes. And the record is, as I understand it, going back a ways, that the D1 and D2 unit or whatever it is, has no treatment space, but you've managed to at least provide some inpatient treatment there. I mean, it has no separate rooms. And that in many of the locations where the ELP and where the mental health beds are and so on, there is really, really, really suboptimal space available. And that seemed to be what was compelling this judge who's been dealing with this case for 20 years to think that these people were not going to be worse off. What is the response to this? The D5, D6 program was implemented in 2006. At that point in time, there were no group rooms or treatment space. After a couple of years, the court entered an order that required that group and treatment space be constructed. That construction has occurred, and it was completed in July 2009. When the court approved defendant's plan to convert the C5 and C6 units at Salina Valley State Prison to intermediate care facility programs, the court made it very clear that the construction would be identical to the current D5, D6 unit, which includes the group room and treatment space. That's absolutely true, and, of course, that's optimal, and it will be true in the long run. But the question is that we have a district court who has been involved in this case for 20 years, and in his judgment, looking at the record of the current situation, going back, these people are better off being transferred than being left where they were, and that there are ways to make do, as was done in D5 and D6. It's all compromises, and it's not a good situation, but it's a better situation. Now, how can we as an appellate court disagree with that? Well, Your Honor, we disagree that the court may define that the moving the inmates to the D5, D6 unit is better based on current conditions in the DOP unit. While it's correct that the court made a statement during the evidentiary hearing with respect to his opinion on treatment that was being provided at CDCR, there's no finding that the treatment that's currently being provided violates the Constitution, nor is there any specific finding in the court's order that the judge considered the requirements under the prison litigation format or that the order that is issued is the most narrow and least intrusive order, specifically with respect to the 10 inmates. There's nothing that discusses why 10 inmates would be the optimal number to put into the program, rather than five, which the Department of Mental Health has determined is the clinically appropriate rate. You're coming up almost to the end of your 10 minutes now. Do you want to wrap this part up? I have one more important question, which is, could you just articulate the irreparable harm that was justified this day? Yes. The irreparable harm is to the inmates as well as to the Department of Mental Health clinicians. With respect to the inmates, the inmates during the admission process are not receiving treatment at guard time. They're being held in their cells. There's a chance that those inmates could decompensate and become violent. Conversely, where they're at now or where they were, they were receiving treatment. The harm to the Department of Mental Health clinicians is that those clinicians are being forced to provide a level of care that falls below the standards required by law and are being exposed potentially to state law claims for violation of their movement. Is there any proof that they were receiving treatment where they were? Excuse me? Your Honor, I didn't hear the question. Have you offered any proof that they were receiving treatment where they were as opposed to what they were supposed to be? No, Your Honor, but there hasn't been any evidence presented that they were not receiving treatment. The evidence on the record is what Ms. Brewer testified to with respect to receiving 10 hours of treatment in an EOP program. But there's a long, long, long record in this case which suggests that people in these programs were not receiving treatment necessarily. So are we limited to the current record on this particular motion? It's the defendant's position that if you are given the requirements under the CLRA that the court has to look at the current position and there's no evidence of any violations with respect to the current position. All right. Any other questions before we turn to Ms. Whalen? Well, I just – why isn't the issue of conformity to state law totally irrelevant to our consideration? The judge has taken care of that by saying that's all wave. Now, unless you can make a medical showing or a need from a standard of care or psychiatric needs, what does state law have to do with this anymore now that the judge has said it's waived? The Title 22 requirements that were waived relate to treatment. But he's willing to waive them all if you just tell him what you want waived, isn't he? Yes. He is willing to waive all of the state law requirements. So your remedy is just to tell the judge here's the list of requirements under the state law that we want waived and that's all done, is it not? The waivers relate to licensing requirements. I know, but it is not a barrier to anything that he's ordering you to do. Am I right? It's a barrier to the extent that the clinicians cannot provide the appropriate treatment and that the – But that's not a matter of law. He's saying you won't be in violation of the law because he's going to waive it. Now, there are other arguments about professional needs but not legal needs. Am I right? Yes. Okay. All right. Why don't we hear again from Ms. Whalen. Good morning, Your Honors. This is Amy Whalen for Appellees of the Coleman Class. This day motion before you is about Coleman Class members' inability to reach desperately needed inpatient psychiatric treatment and whether this court should disturb a modest but life-saving order issued by the district court after extensive factual findings, including an evidentiary hearing. Defendants have not come close to meeting the extraordinary requirements for a stay. The Supreme Court recently held in Ken v. Holder that the state must show more than a mere possibility of success on the merits and more than a mere possibility of harm. With respect to likelihood of success on the merits, the state has failed. Facing the state's inability to provide necessary inpatient psychiatric care to prisoners for the past two decades, the district court took all of the necessary steps that the PLRA requires. For instance, it deferred in the first instance to the state to create its own plan, including a timeline to address the crisis, inpatient bed shortages. The court then accepted that plan, even though it would leave inpatient shortages for many years. And then when it became clear that the state had failed to meet its own deadline and that opening these emergency units had been repeatedly delayed, the court did not simply order release but instead held an evidentiary hearing. It then made explicit factual findings regarding the balance of hardship and only then issued a very modest order to accelerate patient admissions by only five patients per group. Could I just ask one question? Running through this, their basic argument is, okay, we can comply with the order, but then the individuals don't get any treatment. If that's the case, is that in violation of some other part of the order, or do you just accept that that might be the result of your challenging this emergency stay? We accept that that may be a result because that's the position we've been in for the past two decades, where our clients have been completely unable to reach inpatient care that they need desperately and where they then suffer in these improper placements. The court asked questions about those placements and what evidence is in the record. There's a very long history in this record that even the EOP units, which are outpatient units, have serious problems providing care, particularly to people like the patients at issue in this motion, who are often psychotic and delusional, and everybody agrees, including the CDCR and DMH, require inpatient care. They are not receiving inpatient care in any of the other units in which they remain, and they are often not receiving even the minimum 10 hours per week that they're supposed to be receiving in those units. Where in the record do we look to find evidence regarding where these people are coming from, what treatments they're receiving in the places they're coming from, particularly those two questions? The record before the district court is the long history of special master reports about all of the EOP units and the care provided, as well as the judge's own history of hearings about these issues. The district court here held evidentiary hearings back in 2006 regarding very similar issues about access to higher levels of care and found that people were languishing in horrific conditions as they were waiting for this care. Now, we're being told that these people are coming now from general population EOP programs, but I thought the idea was to transfer people who were at higher levels of both custody and medical health care. So where are they coming from? Well, there actually is something in the record that shows you where each of them come from. An example is appendix, and I don't expect that you turn to this, but Appendix C to the Declaration of Michael Dean, which we submitted, and attached to that is in Exhibit C. And on that document, it basically shows data from February of 2010. And if you turn to the very last page, Appendix H, it shows you all of the people waiting on the SBCP wait list. And in this particular month, there were 30 patients waiting in a psychiatric administrative segregation unit, 46 patients waiting in a mental health crisis bed, which is an inpatient unit, but it's intended only to provide care for a maximum of 10 days. There were 46 patients in an acute unit, but the vast majority of the patients, 302 of them, were in these EOP units, which are outpatient units where people do not receive appropriate care and don't receive any inpatient care at all. Judge Levy, I think, or someone asked you whether, in fact, these people, when they're transferred, or maybe it was just Q&R, are not going to receive treatment, at least in the short run, and you say, well, probably so. So then what is the advantage of transferring them? Well, on this record, and as the district court has a lot of experience with these defendants, often the dire predictions that they make don't actually come true, and that's true on this record as well. Victor Brewer, who runs the C5 and C6 programs and the D5 and D6 programs at Salinas Valley, in the briefing to the court below predicted that all treatment for every patient who has been admitted into C5 would halt with these accelerated admissions, and in his declaration that he submitted before this court, he basically admitted that that never came to pass, that they figured out a way to provide inpatient care to the 25 patients who had already been admitted and that that harm never resulted. So this district court has experience with these defendants over the course of two decades where they have been making predictions like this and where they just don't come to pass. In addition, we really need our clients to get into these units where they at least have the hope of having access to licensed psychologists and psychiatrists who are in the units and available, particularly if they're in a crisis, and that's just not the case in the places where they are lingering while they wait for these beds. This is Judge Levy. I just want to go back to a question that was asked about where these patients are coming from, and your response was that there are so many in isolation or solitary confinement. It isn't necessarily so that those are the persons who are coming, though, is it? You just recited the scope of the overall problem and the numbers involved, but do we know specifically whether these patients are coming from the general population or are they coming out of some segregated, isolated units that they're in? Do we know? We do know from the data that I was talking about before. One of the numbers I didn't get to yet was that 110 of the 551 patients back in February of 2010 who were on the waiting list were in administrative segregation EOP units. I think what Judge Levy is saying is that from something in the record, I understand that there's a bit of a struggle between different people as to who should stay in this unit, but that the mental health people prefer to have general population EOP people and not higher level custody people, and from what was just said, that seems to be who they're getting. Is there any reason to think that isn't true, and how does that impact the question of whether they're better off where they are or not? In other words, they don't seem to be getting the segregated unit people and so on, potentially because they don't want them. Well, historically these units have gotten these segregated people. With C5 and C6 in particular, descendants were claiming that they were going to pull the patients primarily from EOP units. We don't know if that's what they've been doing or not because we just don't have data on that yet. Our data is basically at least a month behind in terms of who exactly they are admitting. But there's no question on this record that the people will be better off in these inpatient units than the units they're lingering in as they wait. And you think there is a finding to that effect? Yes. Which is where? Where would we find that? I'm sorry? Maybe I'm asking the same question. Where would we find that finding? The court made findings in both orders that 400-plus patients were lingering in conditions that the special master and the court had previously found to be horrific conditions. And did he make a finding that there would be better off here even if they're not receiving any treatment? Yes. He said explicitly on the record that, similar to what I just said, that they would at least have the opportunity to have access to licensed clinicians, including psychiatrists, in order to help them in a time of crisis. Whereas in the places they are now, they receive no inpatient care at all. Mm-hmm. Now, let me ask if initially you or your co-counsel did not advocate that, what was it, 20 or so be moved every month or 15? That was your initial position? Initially, we were urging, yes, even more than 10 per week, the admitted entity unit. Now, is there any rational basis for all that you have said? Why you couldn't fill it up on one day and bring in all 58 on one day as opposed to 10? Is one of those numbers any less arbitrary than the other? Well, the court was giving extreme deference to the state when it said that it needed time to process some of these patients into these units. And so the court explicitly listened to the state when it said, we can't just bring them all in at once because of the units. And they also said, we can't bring in 10 a week. It said, we can bring in five a week. And then it created a kind of a chamber of horrors if 10 were brought in each week, including lockdowns and no treatments. And what is the rational basis for selecting 10 as opposed to 15 or 20 or 58? Is there any professional caregiver who has testified that any of those numbers will work, other than the five, that is the number five that the staff claims, is there a functional limit? Yes, Your Honor. There was experience that this district court had only about a year or two ago with another DMH unit at Atascadero State Hospital where it was a similar problem where the unit needed to be filled up quickly with patients that were backlogged. And the court found and determined that DMH should admit 10 patients per week into Atascadero rather than five. And the state was able to do that and did that for the entire time period that the court ordered it. So the district court had direct experience in terms of how many people these DMH units could take in, how many they could process appropriately, and what balance they had to make to do that. And he just did not find it credible that DMH, that the horrors that they paraded before him, that would occur with 10 patient admissions per week would actually happen. He didn't actually find that, i.e., that it wasn't going to happen. What he found was, or a suggestion, and what you've suggested, is, well, we know worse off when they may be federal. Isn't that more accurate? That's true. That's true, but it was also within the context of his history of knowledge with these defendants and what they were able to do in the past. I mean, he also, which is exactly what this court has to do, weighs the harms. And he determined that the harm to Coleman class members who are lingering in these other placements as they wait to come in is much more severe and much more significant than any speculative harm to clinicians that the state was arguing before him in the motions below. Well, they're arguing that the irreparable harm is not only to the clinicians but to the patient inmates. Can they legitimately do that? I don't think they can legitimately do that. Their test is that they have to argue that they, as the moving party, are irreparably harmed. They can't really assert our client's harm in their defense as part of this Bay analysis. Well, they claim that they're responsible for these people and that harm to them is harm to the institution. That's true. But, you know, we as the representatives for those clients, I think, have a much better grasp and have a much better origin from which to claim what harm is really happening. Okay. Your time has expired, but is there any more panel questions before we return to the rebuttal? No, thank you. Judge Berzon, anything? No, thank you. Thank you. We'll turn back then to Ms. Worth. Thank you, Your Honor. Just a few points. Again, the court did not make any explicit findings with respect to the PLRA. In fact, the first order doesn't even mention the PLRA. First of all, if that were so and it was a problem, well, let me just set a time and question it. As I understand it, the whole first section, C-5 or C-6, I forget which it is, is full now. Is that right? Yes. So anything we're taught, so it's really not an emergency, because you're not going to start admitting anybody else for six weeks or so. Is that right? The defendant's position is that it still is an emergency because the inmates that were admitted to C-5 after the October 25th order still are not getting treatment and yard time. Are you going to send them back? If we issue an order to send them back? I think that's certainly an option. If they're not getting treatment and yard time now and sending half of them back to a program where they were getting treatment and that makes more sense, then, yes, that would be something that would be considered. But the more important, perhaps, what you were getting, Your Honor, is the fact that beginning January 18th, C-5 will again start admitting patients. At that point, if the court's orders stand, they will be required to admit. All right. What I was saying is, so from my point of view, it looks like it's not an immediate emergency to the degree that if there were some procedural defect in the court's order, it could be remedied in the meanwhile. But what I would like to know legally is, is your understanding of the PRLA requirement that, essentially what it seems to me the judge was doing here was enforcing an earlier order, the earlier order being that this program be set up and operating as quickly as possible and that people be transferred as soon as possible. Now, every time he issues some suborder to an earlier order, do you think the PRLA has to come back in again? Your Honor, I would disagree that there was ever an order that required the DMH to admit 10 inmates a week into this program. When this program was set up, it was set up with the DMH set it up to admit five inmates per week. Did the judge approve that? Yes. Well, let me back up. The fed plan does not expressly say that DMH is going to admit five people a week. And also the whole program was way delayed for various reasons, including the fire marshal and all that. So it was up and running much later than it was supposed to be, and therefore it appears that Judge Carlton-Faulton was essentially implementing an earlier order as possibly feasible. Does he do a PRLI on every detail? Yes, Your Honor. PRLA findings? Yes, that is defendant's assessment. In addition, this project was delayed by three months. In a prior filing with the court, the defendants had represented that they had looked at ways to accelerate it and were unable to come up with any ways to accelerate it. This project is very different than the ASH project, for instance, that was brought up before. It's a different type of program. ASH is in a state hospital. It has a greater number of admissions fees. It doesn't have the physical plant limitation. And, yes, CMH did admit 10 inmates a week into that program, but it's a very different program. It has other mixes of patients. They had the flexibility to juggle or adjust admissions. They opened up another unit at a different hospital to create rooms. That is very different than this small program within a prison that has two units for 58 inmates. It's a completely different scenario. In addition, with respect to the evidence that plaintiffs have brought up concerning violations that occurred in 2006, those violations were not discussed as part of the evidence we're carrying. They're not in the record. They're in the record of the case. Well, they're in the record of the case, yes, but they're also from four years ago, Your Honor. We're looking at 2010. We're not looking at 2006. It's been a position that under the PLRA, the court must consider current conditions, not conditions from- Why is that the record of the three-judge court? Is that before us? The record for the three-judge court? No, Your Honor. I would contend it's not. Why is that? It's just an implementation of an order in this case. Is that a separate case, or it's just a continuation of this one? Your Honor, it's a separate case, and the issue before the three-judge court was whether overcrowding- That was for the issues, but there were extensive declarations submitted about the conditions in which people were being provided mental health care. Even with that case, Your Honor, the conditions were only valid-the conditions, my understanding, were only through 2007 and 2008. Okay. Your time has expired now, I think, unless there's more questions from the panel. Anything else? No, thank you. Okay. Well, we'd like to thank both counsel for making yourselves available for argument. As you can appreciate, it's a hefty record, and you all have been at it for quite some time, we know, so we appreciate your ability and willingness to be available to answer questions. And with that, we'll conclude the argument, and we will all hang up, and then, Monica, you can proceed from there. Okay. Thank you. Thank you. Thank you. Thank you. Thank you.
judges: Leavy, McKeown, Berzon